IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Criminal No. 1:15-CR-118 (CMH) |
| | ) | |
| 1. MOHSIN RAZA, | ) | Sentencing Date: April 29, 2016 |
| | ) | |
| 2. HUMAIRA IQBAL, | ) | |
| | ) | |
| 3. FARUKH IQBAL, and | ) | |
| | ) | |
| 4. MOHAMMAD ALI HAIDER. | ) | |

## GOVERNMENT'S POSITION ON SENTENCING

The United States will address the sentencing issues of all four defendants in this one memorandum. For each of the defendants, who went to trial and continue to refuse to accept responsibility for their crimes, the United States requests sentences of substantial incarceration and a restitution judgment of $2,189,946, a figure consistent with the pre-sentence reports. For reasons discussed below, the United States seeks sentences significantly greater than one year and one day for all four defendants. The United States also asks the Court to enter the agreed upon forfeiture order and states that the United States will not be requesting any fines. Finally, because each of these defendants is likely to appeal his or her sentence, to facilitate appellate review, the United States asks the Court specifically to refer to the defendants' arguments regarding the 18 U.S.C. § 3553 factors before pronouncing the respective sentences.

**Sentencing Guidelines**

The United States agrees with the Probation Officer's calculation that the Sentencing Guidelines suggested range for Mohsin Raza is 87-108 months imprisonment, but disagrees with the calculations for the other three defendants. The Probation Officer calculated the range for Humaira Iqbal as 63-78 months; however, the government believes that there should be a two–level enhancement for abuse of trust, which would raise her range to 78-97 months. The Probation Officers awarded role reductions and calculated the Guidelines ranges to be 46-57 months for both Farukh Iqbal and Mohammad Haider; whereas, the government believes that neither of them should receive role reductions as minor participants. The government believes that their ranges should be 57-71 months. With that said, the government will not be advocating for sentences above the ranges calculated by the Probation Officers.

Loss Amount

The base offense levels for the defendants are 7 for each offense of conviction. The Probation Officers increased the offense levels by 16 because the loss amount was between $1.5 and $3.5 million for the loans on the 13 properties identified in the indictment and covered by the trial testimony. For the loans on 12 of the properties, to arrive at the loss figure, the Probation Officers simply subtracted from the outstanding principal amounts the amounts of the proceeds received from sales following foreclosures and short sales. For the 13th property on Lambert's Lane, the first loan was modified and is performing, so there was no loss on that loan. As part of the modification process, SunTrust wrote off the second loan as a total loss. Accordingly, the Probation Officers considered the outstanding principal amount on that loan as a loss. Nevertheless, the borrower for some reason has continued to send in payments on that loan, and those small amounts have been subtracted. Technically, those payments should only be used to

reduce restitution, not the Guidelines loss amounts, but the government is agreeable to making the figures the same.[1] The Probation Officers methodology is consistent with the instructions in Application Note 3(E)(ii) to Section 2B1.1 of the Guidelines.[2]

The government expects that the defendants will object that their loss amounts should only include the losses on the loans that they personally caused to be approved as loan officers. All of the defendants, however, were convicted of the conspiracy charge. The Probation Officers properly found that all the defendants should be responsible for the loans on all 13 properties. The defendants jointly decided to use the Annandale office of SunTrust Mortgage to cause fraudulent loan applications to be approved. Although each defendant had his or her own loans, it was clear at trial that they did not work wholly independently. Raza and Humaira Iqbal worked together in his office with his computer. Farukh Iqbal and Haider purchased false documents from Ranjit Singh for themselves and for the clients of the other two defendants. All of the defendants either asked for the assistance of co-conspirator Rina Delgado and/or provided her with assistance on her fraudulent loans. This was an office, therefore, where everyone was involved in obtaining fraudulent loans for clients and knew that the others were doing so as well. It was foreseeable to each of them that the other defendants were likely to obtain fraudulent loans as part of the criminal conspiracy that were in addition to the fraudulent loans that relied upon false documents received directly from co-conspirators. Accordingly, each of the defendants should be responsible for the full loss amount. See *U.S.S.G. §1B1.3* (Relevant Conduct).

---

[1] Although the victims have submitted figures for miscellaneous expenses, such as lawn mowing and foreclosure expenses, the government and the Probation Officers have not tried to factor in the allowable expenses to the Guideline loss figures or restitution.

[2] The Government has included with this filing the declaration of Special Agent Gonzalez with documentary attachments to support the findings of the Probation Officers (Exhibit 1).

<u>Abuse of Trust</u>

The Probation Officers also applied the abuse-of-trust enhancement of two levels for the Guidelines calculations of Raza, Haider, and Farukh Iqbal, because they were all loan officers who occupied positions of trust and used that trust to commit their crimes. As loan officers, each defendant selected the appropriate loan product for each applicant after interviewing the applicant and receiving the pertinent information. Most importantly, the defendants, who were the only ones to meet with the applicants, were the ones in the positions to evaluate the reasonableness and accuracy of the information that they received from the applicants and the authenticity of the documents submitted in support of the applications. As an underwriter testified at trial, the underwriters did not investigate the information that was submitted. Instead, the loan officers were entrusted with that function. Accordingly, when loan officers who have been employed by the lending institutions have been convicted of loan fraud, the courts have found that the abuse-of-trust enhancement was properly applied in those cases. See *United States v. Anobah*, 734 F.3d 733, 736-38 (7th Cir. 2013); *United States v. Ugwu*, 539 Fed.Appx.35, 2013 WL 4734077 *40-41 (3rd Cir. 2013). The enhancement likewise should be applied as the Probation Officers did for defendants Raza, Farukh Iqbal, and Haider.

The Probation Officer for Humaira Iqbal, however, did not find an abuse-of-trust enhancement for her. The evidence at trial established that she met with clients seeking loans, just as the other defendants did. There was testimony at trial by loan officer Rina Delgado, loan processor Kusang Lama, and realtor Anna Arduz that they believed that Humaira Iqbal was a loan officer. It appears that the only difference between Humaira Iqbal and the other defendants was that she did not hold the title of loan officer, so the loan applications of her clients were prepared on Mohsin Raza's computer in his office, which Mr. Raza and Ms. Iqbal shared.

4

Because she performed the same functions as the other three defendants who were officially loan officers, Humaira Iqbal should receive the same abuse-of-trust enhancement as the other defendants. See *United States v. Gordon,* 61 F.3d 263, 269 (4th Cir. 1995) ("The abuse of trust enhancement was not designed to turn on formalistic definitions of job type.")

<u>Role-in-the Offense Adjustments</u>

The Probation Officers also applied role-in-offense enhancements for the roles of Raza and Humaira Iqbal. The criminal offenses included, at a minimum, the four defendants and Rina Delgado. Ranjit Singh should probably be included as well, because he knew that the defendants were loan officers and he was selling them fake documents to help borrowers qualify for loans. Accordingly, there were at least five participants. Raza, who was in charge of the office, was the organizer and leader of the conspiracy and deserves the four-level enhancement that the Probation Officer applied in his case. Every loan officer from that office has now been convicted of loan fraud, so it is reasonable to find that the man who directed the office directed a business that was permeated by fraud. In addition, the testimony of Rina Delgado established that Raza was personally directing her criminal activity. For the first few months that she worked for Raza, Raza reviewed all of her loan applications before they were sent to the underwriters. She testified that Raza would have her increase the amount of the borrowers' incomes on some loan applications not because his figures were the accurate ones, but rather to cause the applications to be approved by the underwriters. Raza was directing Delgado, therefore, to commit fraud.

Humaira Iqbal was assessed a three-level enhancement role enhancement, because she was a manager of the criminal activity. Delgado reported to Raza and gave him her loan applications to review. After Delgado had been working at SunTrust for a few months, however,

5

it was Humaira Iqbal who took over the role of directing that Delgado increase the incomes shown for some of the borrowers on their applications. At trial Delgado recalled that Humaira Iqbal occasionally entered the increases in the applications herself using Delgado's computer keyboard. Humaira Iqbal was also the person who directed Delgado to falsely act as the landlord for one of Iqbal's or Raza's clients and gave Delgado the necessary information to falsely verifify that borrower's rent. Finally, Iqbal was the one who at times asked Delgado if Delgado needed assistance, and on two occasions when Delgado needed false verifications of bank deposits, Iqbal took care of them. The three-level enhancement for Humaira Iqbal, who Delgado and Kusang Lama testified ran the office with Raza, therefore, is appropriate.

     The Probation Officers who authored the pre-sentence reports for Farukh Iqbal and Haider adjusted their offense levels downward by two levels each for having had minor roles. Apparently, the Probation Officers were swayed by the fact that at trial the government only proved one specific fraudulent transaction that each of these defendants completed as a loan officer. The evidence at trial and presented in pre-trial motions, however, contradicts the Probation Officers' determinations. Not only did the two defendants buy false documents from Singh for their own two transactions, they each bought many more false pay stubs and W-2 forms. Those forms showed up in four other transactions that were proven at trial for Raza's and Humaira Iqbal's clients.

     In addition, Ranjit Singh testified that when he sold fake documents to Farukh Iqbal and Haider, they told Singh that the documents were to be used to help prospective borrowers obtain loans. The government sought at trial to admit testimony from Singh that he had sold fake documents to Faruqh Iqbal at least 100 times, and Haider approximately 25 times. The defendants objected, and the Court ruled that the government had to severely limit Singh's

6

testimony through leading questions to testimony that he had "sold those types of documents" to Farukh Iqbal and Haider. The Probation Officers should have considered the stricken testimony as relevant conduct when determining the roles of the two defendants. Although the government chose to prove only 13 fraudulent transactions at trial, the conspiracy charge was not limited to those 13 transactions, nor is the relevant conduct. Although the government did not prove that more than six loan files contained fake documents created by Singh, there is clearly proof by a preponderance of the evidence that Farukh Iqbal and Haider bought many more false documents to use in loan files as part of their criminal conduct. Accordingly, the two defendants' roles were not minor. The Court should not apply two-level downward adjustments to either of the two defendants' offense levels.

## Section 3553 Factors

One of the factors that the Court must consider is the desire to avoid unwarranted sentencing disparities. There have been three prior cases against individuals who worked under Raza at the Annandale Branch of STM: Rina Delgado, Emma Barbosa, and Mildred Rosado. Of those three, Delgado had the highest Sentencing Guidelines range of 41-51 months. This Court sentenced her to a year and a day, after taking into account her substantial cooperation and personal characteristics. Her cooperation contributed significantly to the convictions of Rosado, the current defendants, and a defendant unrelated to STM. She also made helpful contributions to the investigations of Michael Krause and Ana McDonald, who both pleaded guilty. Barbosa was another loan officer whose guidelines were 31-41 months. The Honorable Anthony J. Trenga sentenced her to six months incarceration in part because she had confessed when first interviewed by the FBI, pled guilty pre-indictment, and attempted to cooperate with the government, although her recall of specifics was insufficient to make her cooperation substantial

enough for a downward departure motion by the government. Rosado was Delgado's assistant at STM. Rosado's guidelines were 27-33 months, and this Court sentenced her to one year and one day, too, after she had accepted responsibility and pleaded guilty.

It would be unwarranted for these defendants to be considered in the same light as the prior defendants. A defendant who stands before this Court at sentencing denying his or her guilt does not warrant the same level of mercy as a defendant who confesses, pleads guilty, and provides whatever information that he or she can provide. The prior defendant most similar to the current defendants is Rina Delgado. Delgado's acceptance of responsibility and cooperation, however, sets her apart from the four defendants before the Court. *See United States v. Susi*, 674 F.3d 278, 288 (4th Cir. 2012), *quoting United States v. Perez-Pena*, 453 F.3d 236, 243 (4th Cir. 2006) ("[C]omparing the sentences of defendants who helped the government to those of defendants who did not ... is comparing apples and oranges.")

Furthermore, the four current defendants also had roles in the mortgage fraud scheme that were equal to or greater than the prior defendants. Farukh Iqbal and Haider were loan officers similar to Delgado. Each was only charged with one substantive fraud count for transactions in which they were the loan officers. As discussed above, however, if the Court had not granted the defendant's motion in *limine* in part, Ranjit Singh would have testified that he had sold many more false documents to these two individuals for them to use to help borrowers obtain loans. Farukh Iqbal's and Haider's involvement in the conspiratorial activities, therefore, was substantially more than the loans identified in the indictment on which they were the loan officers.

Humaira Iqbal's role, as noted above, was substantially greater than any of the prior defendants and was at a higher level than either Farukh Iqbal's or Haider's. Humaira Iqbal ran

the fraud mill with her husband at the STM office in Annandale. She misrepresented herself to others as a loan officer and even signed her name to one document as a vice-president. Humaira Iqbal was the one who during Rina Delgado's first week asked her to provide a false verification of rent, and later took on the role of causing Delgado to submit loan applications with income levels that would cause loans to be approved, rather than simply showing true incomes. The Court should take into account Humaira Iqbal's role when determining what is a warranted sentencing disparity between her and Rina Delgado.

     Raza's role was the leader of the criminal conduct. This is clear from his position as vice-president in charge of the office rife with fraud, and the testimony of Rina Delgado that she sent all of her loan applications to him for review. Initially, he personally told Delgado when to increase a borrower's stated income to make sure that the underwriters would approve the loan applications and then transferred that duty to Humaira Iqbal. The amount that Raza earned at the office compared to the other defendants also shows his elevated role. During the one full year the defendants worked for STM, Raza was paid approximately $523,000; whereas, his wife was paid about $119,000 and the other two defendants approximately $169,000 and $90,000 respectively. Because of Raza's role as the leader of the conspiracy, Raza should receive the longest prison sentence of all of the defendants prosecuted in this matter. The government believes that Humaira Iqbal's sentence should be the next highest. Farukh Iqbal's and Haider's sentences should be greater than Humaira Iqbal's, but significantly higher than Rina Delgado's sentence of one year and one day.

     The defendants are likely to request sentence reductions because members of their families rely on them. That is true for nearly every defendant, however, unless a defendant is very young or very old. The defendants have other adult family members who will have to take

on the family responsibilities as is the case with other defendants. It will be difficult for these other family members, but those hardships do not warrant sentence reductions for defendants who were involved in widespread mortgage fraud and refuse to admit their guilt and for the most part, accept any responsibility.

With that said, when deciding exactly what sentences to impose, the Court should be aware that although the defendants put the government and the Court through the trial, since that time Raza and Humaira Iqbal have agreed to forfeit some of the assets of value that they have.[3] They have agreed to forfeit two properties with equity of more than $500,000, plus $40,000 in cash.[4] Their decision to do so is not common for defendants convicted at trial. By agreeing to the forfeiture order that will be submitted to the Court, the defendants have helped the Court and the government avoid having to litigate any forfeiture issues. The defendants' willingness to settle the forfeiture allegations benefits all involved and should be taken into account by the Court.

Finally, Mohammad Ali Haider has a documented medical problem that reports show can be controlled when he takes his prescribed medication. Several years ago he had a significant problem temporarily when he stopped taking what had been prescribed. The government is not aware of a problem similar to that in recent years. What the government does know is that the problem did not interfere with his ability to commit his crimes or to hold other responsible jobs during the past five years. The government does not believe that the defendant's problem should affect his sentence other than to require him to continue with medical treatment as directed by his probation officer after he completes and period of incarceration that the Court imposes.

---

[3] The government was not able to identify any asset of the other two defendants that had significant value.

[4] The government has agreed not to seek forfeiture of two other properties with equity of approximately $200,000.

**Implementation of Sentences of Incarceration**

Should the Court sentence the defendants to periods of incarceration, the government does not object to allowing them to voluntarily surrender, but does oppose bail pending their appeals.

The government also opposes the Court allowing the defendants Raza and Humaira Iqbal being permitted to serve their sentences on a staggered basis. The defendants have two children, ages four and five, but there are currently other family members who can care for them. That is what happens to the children of single parents when those parents are incarcerated. In this case, the government opposes allowing Humaira Iqbal to remain out while Raza serves his sentence. When he is done, he may deported to Pakistan. If that appears likely to happen as Raza nears the end of his sentence, the government would expect Humaira Iqbal to take the children and return to Pakistan, rather than report to serve her sentence. Even if she does not have her passport, she has knowledge of others who create false documents. Furthermore, by the time that she would report to prison, her parents who have health problems, but can currently assist with the children, are less likely to be able to help with the children.

If Humaira Iqbal were to serve her sentence first, and Raza believed at the end of that incarceration that he was going to lose, or had lost his appeal, and that deportation was likely upon his release, he would have every incentive to return to Pakistan, rather than report to serve his sentence. The government believes that now, while his appeal prospects have not been determined, and deportation is still years away, Raza has more incentive to voluntarily surrender to serve his sentence.

**Restitution and Forfeiture**

The government expects to submit an agreed upon Forfeiture Order for the Court to sign. The government will also submit a Restitution Order based upon the calculations of the United States Probation Officer. The defendants, though, are likely for various reasons to oppose the amount of any order submitted by the government. If that happens, the government will not seek their signatures. Because the restitution is fairly detailed, however, an order is necessary. That is why the government will submit the order described that will be consistent with the pre-sentence report. Should the Court want changes, the government will prepare an order consistent with what the Court wants.[5]

                                Respectfully submitted,

                                Dana J. Boente
                                United States Attorney

By:      /s/_____
     Jack Hanly
     Assistant United States Attorney
     Joseph A. Capone
     Special Assistant United States Attorney
     2100 Jamieson Avenue
     Alexandria, Virginia 22314
     Telephone: 703-299-3700
     Email: jack.hanly@usdoj.gov

---

[5] The restitution amount in the proposed order may in fact be less than the full loss amount. SunTrust sold the first mortgage for the Deer Run Drive property to U.S. Bank, which apparently then transferred it to HSBC. The government does not want to request restitution for that bank, however, until the bank confirms that it in fact is the one that suffered the loss. The agents have been in contact with the bank, but have not received confirmation. If the bank does not respond by the time of sentencing, the government will leave that bank out of the proposed order. If the Court prefers to have the government continue to seek the confirmation, the Court can ask the government to continue trying to get confirmation and defer the entry of the Restitution Order. The agent has been trying to obtain confirmation for more than a month.

CERTIFICATE OF SERVICE

I hereby certify that on April 25, 2016, I will electronically file the foregoing with the Clerk of Court using the CM/ECF system, which will then send a notification of such filing (NEF) to all counsel of record.

                                                        /s/
                                           Jack Hanly
                                           Assistant United States Attorney